**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------×

PAUL SCHWARTZ,

                 *Plaintiff,*

       v.

ANDERSON KILL P.C., GEORGE ANDERSON, and
DONA KAHN,

                 *Defendants.*

------------------------------------------------------------------------×

**23-CV-7204**

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, Paul Schwartz, by his attorneys, Young & Ma LLP, complains of Defendants as follows:

## PRELIMINARY STATEMENT

1.    Plaintiff Paul Schwartz ("Plaintiff" or "Mr. Schwartz") seeks damages and costs against Defendants Anderson Kill P.C. ("AK" or the "Firm"), George Anderson ("Anderson"), and Dona Kahn ("Kahn")(collectively, "Defendants") for discriminating and retaliating against him based on disability, age, and gender; failure to accommodate; and retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §2000e *et seq.*; the Americans with Disabilities Act ("ADA"), codified at 42 U.S.C. §§ 12101 *et seq.;* the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*

## JURISDICTION AND VENUE

2.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over Plaintiff's claims, as Defendants violated Plaintiff's rights under Title VII and the ADA.

3.    Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on or about November 9, 2022.

4.      Plaintiff requested a right to sue from the EEOC on or about April 11, 2023.  The EEOC issued the right to sue shortly on or about May 22, 2023.

5.      Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's NYSHRL, and NYCHRL claims as they are so related to the Title VII, and ADA claims that they form part of the same case or controversy.

6.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of New York, as a substantial part of the events giving rise to these claims occurred within this District.

## **PARTIES**

7.      Plaintiff, at all times relevant hereto, was and is a resident of Nassau County in the State of New York.

8.      Upon information and belief, at all times relevant hereto, Defendant Anderson Kill P.C. was and is a domestic business corporation, doing business in New York City with offices located at 1251 Avenue of the Americas, New York, New York 10020.

9.      Upon information and belief, Defendant George Anderson is an individual residing in Connecticut and works in the New York City office of the Company.

10.     Upon information and belief, Defendant Dona Kahn is an individual residing in New York and works in the New York City office of the Company.

## **STATEMENT OF MATERIAL FACTS**

11.     Anderson Kill P.C. is a NY based law firm founded in 1969 and boasts in its advertising that they are leading in the insurance recovery practice.

12.     Mr. Schwartz is a 65 year old male who suffered a physical injury and neurological injury in February 2022 and was otherwise performing very well in his career in the Firm. After a short

period of time off for his injury, Mr. Schwartz started to receive harassing communications from his employers to return to work before he was ready. He engaged an attorney to engage in a reasonable accommodation process to seek accommodations to return to work sooner than had he waited to fully heal. The Firm immediately suggested Mr. Schwartz needed to end his employment for seeking reasonable accommodations, and later performed a perfunctory accommodations process to support their immediate decision to terminate his employment for seeking accommodations.

13.     Mr. Schwartz has an MBA in Finance from New York University and a Bachelor of Science in Accounting from SUNY Albany.  He has 20 years tenure at the Firm and prior to that another 7 years in large law firms and another 12 years prior to that in accounting and consulting firms.

14.     After 12 years in accounting and consulting firms, Mr. Schwartz served as Assistant Controller and then Controller at Kramer Levin Naftalis & Frankel LLP from 1994 to 2000, NY Office Controller at Salans LLP 2000 to 2001, and NY Office Controller at Greenberg Traurig LLP 2001 to 2002.

15.     Mr. Schwartz joined Anderson Kill P.C. in 2002 and was employed through June 24, 2022, when he was terminated.

16.     Mr. Schwartz served in the Firm as Controller (2002), Director of Financial Services (2007), and CFO since approximately 2015.

17.     Mr. Schwartz reported to the managing shareholder, participated in biweekly executive committee meetings and advised on a wide variety of issues including firm-wide performance, compensation, lateral hires, billing rates and expense reduction initiatives.

18.     Mr. Schwartz supervised a staff of up to 13 in billing, collection, accounts payable, payroll, cash receipts, escrow and general accounting functions.

19.     Mr. Schwartz accelerated client billing and collection, improved realization rate, reduced time required to close the month and distribute prebills to one day, automated accounting for bulk services such as in-house meals, courier, car services and legal research, significantly reducing labor costs and improving billing accuracy.

20.     Mr. Schwartz improved criteria for evaluating shareholder performance and compensation, reduced timeframe required to set prospective equity shareholder compensation from six months to two months each year, and eliminated 100s of hours of executive committee members' administrative time annually; negotiated a new credit facility on favorable terms with a major bank following mass defection and resulting event of default with the predecessor bank; led system conversion from Javelan to Elite Enterprise (2004-2005) and in 2018-2019 led conversion to the Aderant Expert accounting system to replace Elite Enterprise; implemented revenue dashboards at the firm including practice group, office and individual levels which significantly improved quality and timeliness of financial reporting to the executive committee, practice group leaders, and individual attorneys; negotiated large cost reductions for overnight courier and office supplies; implemented profit center based reporting and budgeting; hired new external auditors and tax advisors, which improved quality of guidance and provided opportunity for improved compliance with federal, state and local income tax regulations; automated notification to billing attorneys for cash receipts and accounts receivable; and implemented processes to scan vendor invoices & payments and client payments to enable fast and cost-effective retrieval pre-pandemic.

21.     Mr. Schwartz was and is a member of the American Institute of Certified Public Accountants and Association of Legal Administrators (ALA).  For three (3) successive years, he

was privileged to be invited to lead sessions on topics of interest to law firm financial professionals at the NYC Chapter's annual symposium.

22.     Mr. Schwartz's most significant accomplishments for the Firm's benefit included but were not limited to: (1) PPP loan application and receipt of proceeds – during the pandemic, and while NYC was on lockdown in April 2020 – completing the application (in its entirety) and receiving SBA PPP loan funding of $3 million, being the primary liaison with the community bank lender that was a new relationship, later completing the entire financial data portion on the application for forgiveness, being solely responsible for follow-up questions with SBA resulting in forgiveness of loan in entirety in 2021, enabling equity shareholders to enjoy the benefit of substantial additional compensation to the full extent of the loan forgiveness; (2) transforming an overstaffed and inefficient department into a well-regarded and highly productive department – several employees retained for at least 15 years, with extremely low turnover among direct reports (2006-2021), presenting a very profitable and firm-sustaining forecast to shareholders who were unsure about whether to leave for a merger, when Hildebrandt asserted that Anderson Kill would not be able to survive if it did not merge with an AmLaw 100 firm, and where another outside consultant used Mr. Schwartz's work in his presentation during which he agreed with Mr. Schwartz.

23.     When 55 attorneys left to Reed Smith in 2008, the Firm triggered an event of default with Commerce Bank in that approximately 75% of equity shareholders resigned.  Mr. Schwartz approached Wachovia Bank and worked with their lending team by presenting a forecast and pre-negotiated a credit facility including a working capital credit line, term loan facility and letter of credit in favor of landlord – initiated the deal with Wachovia – and the Firm maintains the relationship with the bank today in its successor version, Wells Fargo.

24.     Although Firm size ultimately went from 140 to 65 attorneys in 2008, it actually became more profitable for the remaining equity shareholders.

25.     The Managing Shareholder recognized on a milestone anniversary one year that the Firm would not be here without Mr. Schwartz.

26.     Mr. Schwartz received approval from the Executive Committee to switch to the Aderant Expert accounting system and he engineered signing the Aderant contract on the last business day of 2017, locking in the lowest possible cost as he knew that Aderant would want to book another sale in that calendar year.

27.     Mr. Schwartz implemented the Iridium dashboard to interface with Elite Enterprise and Aderant Expert – all attorneys have access to their own performance data, practice group leaders, branch office heads and Executive Committee and Executive Director all had access to group data updates daily (live in 2018).

28.     Mr. Schwartz conceived the implementation of software to substantially reduce data entry time and improve cost allocation accuracy with products such as SeamlessWeb, PS Ship for FedEx, and flat files for data transmission from Westlaw and the car service.

29.     Mr. Schwartz frequently reported on practice group profitability.

30.     Mr. Schwartz performed on-site due diligence on a group of 12 attorneys who joined in 2009 in Ventura, CA – examined books and records for continuing client work, client concentration, potential staff and other expense redundancies to determine anticipated contribution to Firm profit.

31.     Mr. Schwartz drafted equity shareholder compensation charts beginning in 2010, shortened time to have the chart voted on and adopted – his predecessor, the then-Executive Director, got 2008 adoption in August, and 2009 adoption in May.   Once Mr. Schwartz was awarded the

responsibility, in 2010 and thereafter, adoption was generally in February or March, and in 2022, adoption occurred before the end of January, less than two weeks before his injury/disability occurred, as further explained below.

32.     At Mr. Schwartz's hire in May 2002, the Firm first demoted the prior older female controller to Assistant Controller at 50% salary reduction, showing the Firm's method of termination is massive reduction of salary (which happened to Mr. Schwartz prior to his termination) so that the long term employee would have incentive to resign.  As a result of this demotion (instead of the Firm being honest with a direct termination), the prior controller, Barbara Ryan, had the opportunity to and obviously worked hard to make sure the remaining staff were uncooperative and gave Mr. Schwartz a difficult time during her 2 months as Assistant Controller and after her departure.  Ultimately, Barbara negotiated one year's severance at her previous Controller level salary to leave the Firm.  This is in stark contrast to how Plaintiff was treated at his termination when he was a well-performing senior long-tenured employee who had received outstanding bonuses the prior two years and terminated solely because he needed temporary accommodations without any offer of severance.

33.     Beginning then, Mr. Schwartz started a transition to hire more qualified people as he had come from bigger more established law practices and had the experience to identify talent.  Mr. Schwartz's early work was well recognized by Jeff Glatzer, the managing partner at the time.

34.     As a result of Mr. Schwartz's ability to recognize talent, he was approved to hire Wendy Epstein, Margaret Green, Rudy Pajooh, Robyn Hess, and Alexa Acevedo, cultivating a culture of high performance and excellent teamwork where each member helped the others with no need for competition among department members.

35.     In March 2018, Defendant George Anderson became the Executive Director.

36.     The previous Executive Director, Robert Lincoln, who had served for eight (8) years, and upon knowledge and belief had no pressing health issue, had resigned on or about January 2, 2018, giving zero days notice to the Firm.  Mr. Schwartz concurrently held down the CFO position and handled the most essential elements of the Executive Director role for over 2.5 months until George started with the Firm - all of this during the portion of the business cycle when prospective equity shareholder compensation was determined.

37.     At the 2019 holiday party, Mr. Schwartz was acknowledged for bringing the Aderant Expert accounting system live and got a special award (night at a hotel and dinner for him and his wife) from the Managing Shareholder.  He publicly thanked his team and praised their hard work and gave each person $25 to allow them to participate in the tangible part of his award.

38.     Mr. Schwartz was publicly acknowledged at the 2013 and 2019 Manhattan boat cruises, and the 2021 equity shareholder dinner, with his wife in attendance at two of these events.

39.     In Mr. Schwartz's review for the fiscal year ending August 31, 2020 issued April 4, 2021, the Firm wrote:

   a.   "Paul manages to juggle the demands from the highest level of the firm, supervise and support his staff and let them know that they are appreciated, and also get work done. Paul is compassionate when dealing with others, thoughtful and precise in his communications and determined to get things done – and get them done well."

   b.   "Paul sets a high standard in work product for the internal and external people he deals with. Paul addresses problems and always offers a proposal to address/resolve issues"

   c.   "Who but Paul could do what he does for Anderson Kill. He is an essential piece of the firm's operation- both from the standpoint of the nuts and bolts of his job

responsibilities but also his leadership within his team. He is responsive at all times – weekends, mornings, evenings- there is never a time that Paul is not responsive. Also, when Paul is 'in the middle' of something, he is responsive and lets you know that he needs to get back to you. Excellent all around."

    d. "Paul has excellent knowledge of the firm and all aspects of accounting and financial management."

    e. "Paul's work product is excellent" singular mention that Department is less effective than two years ago however also acknowledges not his fault "This clearly has been a difficult year, and I suspect its been more difficult in the accounting department due to turnover and changes in procedure."

40.    Mr. Schwartz's previous review before the April 4, 2021 was delivered to him more than 3.5 years prior and therefore implicit is that the Firm was very happy with all aspects of Mr. Schwartz's performance which is also evidenced by continuous bonuses.

41.    There was absolutely no suggestion before Mr. Schwartz's injury and leave of absence that he would be fired, and in fact he got a $75,000 bonus for his performance in 2020 and $80,000 for his performance in 2021 in accordance with the Firm's discretionary bonus policy for effectively managing a substantially remote operation and driving firm profitability, and also achieving the $3 million SBA loan forgiveness, much of it with favorable tax treatment for the ultimate individual recipients.

42.    During the pandemic, given Mr. Schwartz's age and health circumstances, he did not come into the Firm physically from March 11, 2020 to mid June 2021. His team came in generally 1 day a week after NYC permitted law firms to re-open. Although Mr. Schwartz had a medical note, the Firm was unhappy about this purely due to the optics.

43.     In a June 3, 2020 note, Dr. Richard B. Rubin said, "He [Paul Schwartz] is 62 years of age and has a history of Coronary Artery Atherosclerosis and a strong family history of heart disease. It is my medical opinion that he would be at increased risk for working in the office setting.  His spouse has multiple medical problems and would be at risk for a severe illness if she were exposed to infection.  The length of time for which this recommendation applies is indeterminate."

44.     In mid June 2021, Mr. Schwartz agreed to come in physically 1 time a week, which would be raised to 3 scheduled days a week after Labor Day.

45.     It was not until July 28, 2021 the Firm announced that staff will return to the office 3 days a week in September in  "Safe Return Phase Three" so Mr. Schwartz was not really accommodated that much despite his long successful performance and legitimate medical need.

46.     The Firm's failure to accommodate is systemic. Robyn Hess left in early 2019 with 8 years tenure as the Billing Manager as she was unable to handle the heavy workload associated with the accounting system conversion and long commute from Leonardo, NJ to midtown and she had requested to work in the Firm's Newark office part time.  Her request was refused. But after two unsuccessful replacements in an extremely tight labor market, the Managing Shareholder was willing in early 2020 to rehire her on her terms, and she got her accommodation prior to the pandemic.  Plaintiff was treated much worse, as explained further below.

47.     Wendy Epstein (Accounts Payable/Escrow Manager) with 15 years tenure was forced to resign after she chose to remain in Florida to be her mother's health care advocate (July 2021). Wendy had resided in Florida since November of 2020, and had shown that she was capable of handling the position entirely remotely.

48.     Pam Deolall resigned in late 2020 to take a job fully remote; Sharon Miller, who took her place, resigned after her husband had a high risk medical condition and asked her not to go to the office.

49.     The Firm (by delivering a letter) forced Alexa Acevedo, the newly promoted accounts payable and escrow manager suffering from a heath condition, to come into the office three days per week beginning in September 2021.  When the Managing Shareholder required that a member of the accounting team come into the office on December 31, 2021 (a Firm holiday), Alexa Acevedo, having the right skill set, and being the only staff member who lived in Manhattan, was chosen to wait for the Fed Ex delivery and scan/deposit the $4,000 in checks that were delivered. She likely got COVID-19 and pneumonia from that day and was then out of work for months. Upon knowledge and belief, she has still not returned to the office, performing her job function entirely remotely.  Plaintiff was treated much worse, as explained further below.

50.     Margaret Green (Senior Staff Accountant) also threatened to resign in January 2022 because she did not want to commute from Beacon, NY three days a week and had a competitor offer near her home. The Firm gave her a raise and asked her to come 2 times a week (and upon knowledge and belief she was paid over $200k per annum when attempting to take over Mr. Schwartz's role during his disability in 2022 and, upon knowledge and belief, still comes only 2 times a week). Plaintiff was treated much worse, as explained further below.

51.     Jessica Ramos , a commuter-by-subway was forced (by the Firm delivering a letter) to come into the office 3 days a week during the third trimester of pregnancy and with knee pain beginning in September 2021.  The Firm told her that her medical conditions would exist whether she worked at home or commuted into the office.

52.     While the Firm failed to properly accommodate many employees that had  disabilities or health needs, the Firm disproportionately treated male employees much worse in the post injury/health crisis and/or accommodations process, respecting only the outdated stereotype that men must put in "face time" physically in the office.  The below are only snapshots of examples that show the pattern and practice of discrimination.

a.   Don Flynn mysteriously left the Firm after becoming ill.  Don Flynn is a White male with the Firm more than 15 years before his illness.

b.   Mark Guercio (White male employee with 19 years tenure) had kidney issues in Summer 2021 and went on short term disability like Plaintiff and so Human Resources indicated that he would be leaving the Firm by February 2022 without any accommodations process.  After his transplant, he was healthy and well but the Firm never reconsidered its position even after such long tenure, nor did it make any overtures to continue discussions with him as to potential return.

c.   There was a contractor who was a previous employee named Martin Francis who suffered an unfortunate severing of his finger on the job and was prohibited from servicing the Firm shortly thereafter in 2022.

d.   In addition to the previous examples of women treated better than men after having health issues or requesting accommodations for other reasons (Robyn Hess, Margaret Green and Alexa Acavedo), Veronica (Ronnie) Mordan was also allowed to work from home after hip replacement without significant pressure to return or having this accommodation be referenced in her future performance.

e.   Christina Yousef had two maternity leaves close to the time she was allowed 3 months paid time off when she had an accident in her bathtub.  The time off she

took for maternity leaves and her disability did not affect her future at the Firm and she was ultimately promoted to shareholder.

    f.   The Firm has a distinction of its maternity and paternity leave policies and as a whole, the male employees took much less time off when having a child.  This is closely mirrored by the time off allotted to men after accidents/injury/health needs and the distinction of the accommodations provided based on gender.

53.    On February 4, 2022, Mr. Schwartz unfortunately fell on a Friday night and hit his head taking out the garbage. He saw a neurologist and got a CT Scan on Monday, February 7, at Northwell. Mr. Schwartz had incessant headaches in any overstimulation. His post-concussion syndrome was treated at LI Neurology Consultants by Dr. Hanauer. He worked with Transitions Long Island in Speech and Occupational Therapy – working through post-concussion syndrome issues including but not limited to information retention, executive functioning, ability to multi-task increasing frustration tolerance, and increasing computer screen time exposure – and it was recommended Mr. Schwartz needed to reduce from hundreds of emails a day.

54.    On February 7, 2022, a note from Northwell Health said, "It is medically necessary for him to minimize his computer time due to this condition for the next 1 month."

55.    Long tenured attorneys generally get 26 weeks of paid time off under the Firm's policy on disability. Although the current language of the policy refers to attorneys, in practice the policy also applied to staff that took time off such as for Veronica (Ronnie) Mordan, Margarita Vargas, Kelin Ramos, Alexa Acevedo, and several others.

56.    Once Mr. Schwartz took leave, he immediately received pressure to come back to work.

57.    On February 10, 2022, Mr. Schwartz emailed Defendant Anderson, "I am concerned about potential for comments pressuring me to just get things done which will not move me forward."

58.     On February 24, 2022, there was a problematic call with Defendant Anderson where he asked if Mr. Schwartz was attending the Executive Committee meeting the next day. Mr. Schwartz said he was not up to date on Firm issues and should not be working or on a call.  Anderson pressured about whether Mr. Schwartz can increase screen time. Mr. Schwartz told him he can do discrete tasks like the Billable Hours Report but not with also incessant emails such as this matter needs to be opened or this wire transfer needs to be approved.

59.     Mr. Schwartz was pressured again at the end of the call to join EC meetings.

60.     On February 28, 2022, Mr. Schwartz reported to Carolyn McGoran in HR, "I am very uncomfortable with our discussion from this past Friday.  I am not comfortable with my business judgment or recall of miniscule events from a couple of months ago, and my input should not have a bearing on anyone's salary or standing in the firm.  It exhausted me to try to recall the pertinent facts, and I am not confident in what I told you…As to your comment that in today's remote world, there is slippage when people are on short-term disability, and that they do occasionally work, I just don't think that's the case – or at least it should not be.  Further, George called me this past Thursday to ask me if I wanted to participate in a two-hour call on Friday, and when I told him that I did not and that I did not have any current information to provide, he pursued that request a second time. That pursuit also made me uncomfortable enough to mention it to you."

61.     This was a clear report about retaliation when sick.

62.     On March 28, 2022, the Firm emailed Mr. Schwartz that they are considering bringing in a temp but struggled to find one with law firm experience and was considering giving Margaret more responsibility. Defendant Anderson said, "I would like to discuss how you can reengage at a limited level and assist with some of the tasks that you alone can do.  Particularly the forecasting and analyzing individual and firm performance."  They also said with temporary staffing they think

they can cover reporting and day to day tasks.   Therefore, the Firm contemplated this accommodation of tiered return, which is the accommodation Mr. Schwartz later asked through counsel and doctor's notes.   At this time, Mr. Schwartz was still healing and not ready to discuss accommodations.   Also, his short term disability had been extended at the time they emailed, so the Firm knew he was still on leave on disability.

63.     On April 6, 2022, Mr. Schwartz had a note from Long Island Neurology Consultant Dr. Eric Hanauer, "Mr. Schwartz is being treated for multiple post-concussion syndrome symptoms that prohibit him from performing the duties of his job. It is recommended that he remains out of work until 5/2/2022 pending clinical course."

64.     On April 7, 2022, Defendant Anderson wrote an email, "Please let me know when you are ready to discuss some limited re-engagement."

65.     On May 9, 2022, Mr. Schwartz submitted a reasonable accommodation note that said he had (1) Mild Neurocognitive Disorder Due to Traumatic Brain Injury (G31.84), and (2) Adjustment Disorder with Anxiety (F43.23).   Mr. Schwartz asked for:

  a.   Reduced flexible hours—15 hours a week to start to be reevaluated after 90 days

  b.   Adjustment of his workload to match the hours he is available to work

  c.   The ability to take a partial or full day off on short notice

  d.   Additional time allotted to finish assignments

  e.   The option to work remotely for the foreseeable future.   Mr. Schwartz has indicated that with sufficient advance notice to allow him to be medically evaluated, he would be able to attend important meetings, such as a banker's presentation.   He can also meet with his staff and the Executive Director.

f.   Access to an executive assistant for assistance in reducing the volume of emails from hundreds a day to less than a dozen

g.   The removal of responsibilities that can be reassigned to someone else, freeing up Mr. Schwartz to focus primarily on tasks that he alone is able to manage and execute and preventing his being distracted by emails that are related to these nonessential tasks.   This includes the reassignment of the "new matter" approval role, the monthly WIP and AR reporting role (which could be handled by a subordinate supervised by Mr. Schwartz), and the weekly SPI leader hours report (which could be handled by an employee involved in drafting the weekly hours report for the Executive Committee whom Mr. Schwartz would also supervise).

h.   If in the near future Mr. Schwartz's symptoms of anxiety do not improve referral for psychotherapy.

i.   Reasonable accommodation process and communications is handled directly with his counsel Tiffany Ma, Esq to reduce his anxiety about this process

66.   In an initial conversation on May 10, 2022 with Mr. Schwartz's employment counsel, Defendant Kahn was friendly and also said they will consider each bullet and see what the Firm can provide. There was no discussion of termination and only a mention she has to go back to the Executive Committee, partners and other attorneys who may not be as familiar with the NYCHRL and its 2019 requirements to respond in writing.

67.   On May 12, 2022, without offering any countering accommodations the Firm was willing to provide, Defendant Kahn, the employment counsel of the Firm, wrote to Mr. Schwartz's counsel, "We determined that the CFO position was such that the essential functions of it could not be fully performed if we granted the requested accommodations."

68.     Then the Firm went immediately to demoting Mr. Schwartz's position to billing manager (which they later disclose is $122,900 with a customary bonus of $5000-$7500 as opposed to the $302k in annual CFO base compensation plus a proven bonus history of $75,000-$80,000) saying, "In any event, we can no longer hold open the CFO position and need to terminate Paul at this time if he doesn't accept the billing position."

69.     Within days of Mr. Schwartz first formal reasonable accommodation request, the Firm decided on termination of him in the CFO position without any reasonable accommodation or cooperative dialogue.

70.     Mr. Schwartz's counsel emailed back that the Firm has utterly and entirely failed to engage in a reasonable accommodation or cooperative dialogue – that they did not respond to each bullet requested as to what it will and will not do.

71.     The next day, May 13, 2022, the Firm wrote back that the CFO role is full time and that they will not let Mr. Schwartz work on reduced hours for 90 days (although ultimately they did not hire a replacement CFO and that person did not start work until after 90 days so the Firm had 0 hours of work in that time and could have used and benefitted from what he was offering as someone that knows the work well).  The Firm first claimed they needed to begin 2023 forecast that summer.

72.     Therefore, Mr. Schwartz said he could work remotely for a limited period of time until the beginning of August.  The Firm would not let him have access to an assistant to reduce the volume of emails to reduce excessive stimulation  and the need to multi-task which severely exacerbated his headaches.  In its email, the Firm appeared to say that Mr. Schwartz needed to fill the responsibilities of the CFO without the necessary accommodations, or else he needed to accept a

Billing Manager role at $122,900 base compensation, which with the full achievement of a customary bonus for that role would be roughly 1/3 of his previous compensation.

73.     In order to keep his job, Mr. Schwartz asked his doctor whether he can comply with the Firm's request. Mr. Schwartz's doctor wrote a May 17 note clearing him to work 35 hours a week immediately (so no longer requesting reduced schedule), that he merely needed to know how to get administrative help when needed and that the return to work in the office can be discussed August 1, as the Firm appeared to have granted that temporary accommodation.

74.     Mr. Schwartz's counsel transmitted this note to the Firm on May 20 with a message, "Enclosed please find an updated doctors note clearing Paul to return to work in his CFO role. Please confirm to me which date Paul should start working and he will initiate contact to George Anderson to move towards the 2023 forecast and modeling."

75.     Therefore, there should have been every reason Mr. Schwartz should have re-commenced his work right away as the CFO with this note.

76.     In a May 23 communication, Mr. Schwartz's counsel also explained to the Firm why every one of his original requests have now been resolved by the second note and their discussions.

77.     Then, in an act of complete retaliation, as Mr. Schwartz had agreed to 100% of their ask, the Firm responded on May 26, "Regrettably, AK has come to the conclusion, after many hours spent by management of the firm considering the facts you and the Doctor have supplied, that Paul, even with reasonable accommodations, cannot perform the essential elements of the job…"

78.     After representing his disappointment that the Firm will not continue the CFO role when Mr. Schwartz can do 100% of everything requested, Mr. Schwartz's counsel responded on May 27 that he would consider the billing manager position for approximately 1/3 the pay (as he didn't

have gainful employment at the moment and he was ready to work with accommodations) but needed to forward the job description to his doctor to evaluate.

79.     On May 31, the Firm suddenly made a new requirement that even for 1/3 of the pay and although the previous billing manager was given more accommodations, Mr. Schwartz would still have to come to the NY office 2 days a week and attend meetings to take the billing manager position.

80.     Mr. Schwartz's counsel informed the Firm that he will speak with his doctors about the billing manager position and what is possible as his previous requested accommodation was for 35 hours of work and from home at least until August 1.

81.     On June 3, Mr. Schwartz's counsel got the next email pressuring him (because the true intention was that he resign), saying, "Accordingly, we will take steps to fill the Billing Manager position by the end of the business Wednesday, June 8, 2022, if Paul does not report to work to start the billing job that Wednesday morning. If he declines the offer of Billing Manager, we will deem him to have resigned and remove him from the payroll, effective Thursday June 9, 2022." The Firm did not fill this position even with an internal candidate until late July.

82.     Mr. Schwartz's counsel then emailed back the same day that he can't get to a doctor until June 9-13 and so he couldn't physically appear on June 8.

83.     Then Defendant Kahn emailed back that day that if the 2 days a week is the only issue, Mr. Schwartz may work remotely until he saw the doctor on June 15.

84.     Mr. Schwartz immediately accepted and his counsel said, "My client can log on and work remotely on June 8th [their required deadline] for the billing manager position."

85.     Then, an hour later, the fact that this was not a true offer to continue employment was revealed when Defendant Kahn responded, "Before we can finalize having Paul take on the Billing

Manager's job, we need clarity as to what his disabilities are of now and whether he needs any accommodations so we can determine if they are reasonable and can enable Paul to fully function in the job." However, earlier they were simply demanding Mr. Schwartz report back to work without this process because they were just hoping he could not or would not do so. His disabilities and needs did not change from previous notes and the Firm again used this excuse to not even offer him the reduced pay Billing Manager position.

86.    At this time, the Acting Controller was only coming in two times a week – so if Mr. Schwartz was going to be required to come in two times a week for the Billing Manager position, he absolutely could have continued his CFO position and in any case the Firm had originally said he can handle the CFO work remotely until August 1.

87.    On June 9, Mr. Schwartz's doctor opined again that he can work 35 hours a week but cannot commute into the office for about two months – the period the Firm originally agreed would work for Mr. Schwartz to sustain the CFO job but now said 2 days in person is required for the Billing Manager job.

88.    Additionally, the Billing Manager job is for $122,900 base compensation, and Mr. Schwartz was obviously allowed to seek his own accommodations by finding employment that would pay more.

89.    Ultimately, several weeks later by July 1, 2022, Mr. Schwartz accepted a job that pays less than the original CFO role with Anderson Kill but pays more than the Billing Manager replacement role, which was the only role that Anderson Kill said was available to him since May 13, just four days after he submitted an official medical accommodation request through doctor's note and from when the Firm found he had an employment lawyer.

90.     In any case, Anderson Kill terminated Mr. Schwartz on June 24 and refused to discuss any other accommodations to make it work, either in the CFO or Billing Manager position.

91.     Anderson Kill's new CFO is John Dunn ("Dunn"). Upon information and belief, he did not start work until mid-August, so the Firm could have accommodated Mr. Schwartz's reduced schedule and also accommodated his working from home until August as they originally said for the CFO role.  Further, Dunn was hired without meeting the core requirements of the job as posted which required a CPA, and a higher number of years of law firm and law firm management experience than Dunn had.  Hence, the Firm sacrificed experience and institutional knowledge in favor of a younger, much less experienced candidate.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Sex Discrimination in Violation of Title VII
### (Against Defendant AK)

92.     Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force as though separately alleged herein.

93.     This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000(e) et seq., for relief based upon the unlawful employment practices of Defendant AK.

94.     AK was Plaintiff's "employer" within the meaning of Title VII.

95.     Plaintiff was a male "employee" of AK and is a member of protected classes within the meaning of Title VII.

96.     At all times, the Company was aware of Plaintiff's sex.

97.     By the conduct alleged in this Complaint, AK discriminated against Plaintiff with respect to the compensation, terms, conditions and privileges of his employment because of his sex.

98.     The Company engaged in unlawful employment practices prohibited by Title VII because of Plaintiff's sex in the manner described in the Statement of Facts.

99.      Plaintiff suffered adverse employment actions and continuing damage by the Defendant due to his sex.

100.    As a direct and proximate result of the Company's unlawful and willful conduct, Plaintiff has suffered and will continue to suffer the loss of income and damage to reputation.  Plaintiff has also suffered and/or will suffer future pecuniary losses, attorney's fees and costs, emotional and physical pain and suffering, inconvenience and other non-pecuniary losses.

101.    As a further direct and proximate result of the Company's unlawful and willful conduct, Plaintiff has suffered and will continue to suffer, among other things, impairment and damage to his good name and reputation, emotional distress, physical injury, mental anguish and lasting embarrassment and humiliation.

102.    Plaintiff is entitled to recover, inter alia, monetary damages and other damages and relief, including, but not limited to back pay, front pay, punitive damages, reasonable attorney's fees, emotional distress damages and compensatory damages from AK under Title VII.

**SECOND CAUSE OF ACTION**
**Disability Discrimination in Violation of**
**the Americans with Disabilities Act**
**(Against Defendant AK)**

103.    Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force as though separately alleged herein.

104.    At all relevant times, Plaintiff was an "employee" of AK under the ADA, 42 U.S.C. § 12111(4).

105.    Defendant AK is an "employer" under the ADA, 42 U.S.C. § 12111(5).

106.    Defendant AK violated the ADA by discriminating against Plaintiff based on his disabilities in connection with employment determinations including, inter alia, pay, promotion, job assignments, training, leave, benefits, and other employment related activities.

107.    Plaintiff suffers from protected disabilities under the ADA, which he made known to his employer AK.

108.    Plaintiff's disability was used by the Company, wrongfully and without basis, to deny Plaintiff the pay, privileges, and other benefits to which he was rightfully entitled by, inter alia, limiting, segregating, or classifying Plaintiff in a way that adversely affects the opportunities or status of Plaintiff because of his disability.

109.    In fact, the Company utilized Plaintiff's disability to torture him and make him uncomfortable and in ways that were detrimental to his health and safety until he was forced to request accommodations that were not granted further limiting his career.

110.    The Company's discrimination against Plaintiff based on his disability and/or perceived disability was intentional and willful.

111.    By reason of the foregoing, Plaintiff is entitled to recover, inter alia, monetary damages and other damages and relief, including, but not limited to back pay, front pay, punitive damages, reasonable attorney's fees, emotional distress damages and compensatory damages from Defendants.

### THIRD CAUSE OF ACTION
### Sex Discrimination in Violation of NYSHRL
### (Against All Defendants)

112.    Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force as though separately alleged herein.

23

113.    This Count is brought under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 et seq., and reference is made to the NYSHRL in its entirety.

114.    At all relevant times, the Firm was Plaintiff's "employer" within the meaning of the NYSHRL.

115.    At all relevant times, Plaintiff was an "employee" of AK within the meaning of the NYSHRL.

116.    At all times, Defendants were aware of Plaintiff's sex.

117.    Defendants engaged in unlawful employment practices prohibited by the NYSHRL because of Plaintiff's sex in the manner described in the Statement of Facts.

118.    Plaintiff is severely limited in his career by Defendants' unlawful conduct due to his sex.

119.    Defendants' conduct, as alleged herein, constitutes unlawful discriminatory practices and unlawful discrimination on the basis of sex as defined by the NYSHRL, by engaging in, causing, perpetrating, committing, authorizing, directing, participating in, aiding, abetting, inciting, compelling and/or coercing the unlawful conduct alleged herein, or attempting to do so, in violation of the NYSHRL.

120.    Defendants are also individually and jointly liable for the unlawful conduct herein, including, without limitation, as an "employer" under the NYSHRL and under the "aiding and abetting" provision of the NYSHRL.

121.    Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of Executive Law Section 296.

122.    Plaintiff's damages include, inter alia, financial loss, loss of employment opportunities, damage to his career and professional reputation, and severe emotional distress caused by the degrading conduct and loss of employment opportunities.

123.    Plaintiff is entitled to recover monetary damages and other damages and relief, including, but not limited to, back pay, front pay, compensatory and punitive damages, and costs and attorney's fees from Defendants under the NYSHRL.

**FOURTH CAUSE OF ACTION**
**Sex Discrimination in Violation of NYCHRL**
**(Against All Defendants)**

124.    Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force as though separately alleged herein.

125.    This Count is brought under the NYCHRL, N.Y.C. Admin. Code § 8-101 et seq., and reference is made to the NYCHRL in its entirety.

126.    At all relevant times, Defendants were an employer and person within the meaning of the NYCHRL.

127.    At all relevant times herein, Plaintiff was an employee and person within the meaning of the NYCHRL.

128.    At all times, Defendants were aware of Plaintiff's sex.

129.    Defendants engaged in, and continue to engage in, unlawful employment practices prohibited by NYCHRL because of Plaintiff's sex in the manner described in the Statement of Facts.

130.    Defendants engaged in, caused, perpetrated, committed, authorized, directed, participated in, aided, abetted, incited, compelled and/or coerced the unlawful conduct alleged herein, or attempted to do so, in violation of the NYCHRL.

131.    Defendants' conduct, as alleged herein, was carried out with malice or reckless disregard for Plaintiff's protected rights to be free from discrimination.

132.   Defendants are individually and jointly liable for the unlawful conduct herein, including without limitation as an "employer" and "employee" under the NYCHRL and under the "aiding and abetting" provision of the NYCHRL.

133.   As a direct and proximate result of Defendants' unlawful and willful conduct, Plaintiff has suffered and continue to suffer injury, with resulting monetary, economic and other damages, including without limitation, lost wages, lost back pay, lost benefits, lost bonuses, interest on the foregoing, and attorney's fees and costs.

134.   As a further direct and proximate result of Defendants' unlawful and willful conduct, Plaintiff has suffered and continue to suffer, among other items, impairment and damage to his good name and reputation, emotional distress, mental anguish, emotional and physical pain and suffering, and lasting embarrassment and humiliation.

135.   Plaintiff is entitled to recover monetary damages and other damages and relief, including compensatory and punitive damages, interest, and attorney's fees and costs from Defendants under the NYCHRL.

**FIFTH CAUSE OF ACTION**
**Failure to Provide Reasonable Accommodation**
**in Violation of the ADA (Against Defendant AK)**
**and the NYSHRL and NYCHRL**
**(Against All Defendants)**

136.   Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force as though separately alleged herein.

137.   The ADA, NYSHRL and NYCHRL require Defendants to engage in a mandatory interactive process and cooperative dialogue to identify a reasonable accommodation for an employee with disabilities such as Plaintiff, but Defendants failed to do so for Plaintiff.

138.   Defendants failed to provide simple reasonable accommodations that would require little to no business burden for Defendants for Plaintiff's disabilities, by refusing to engage in any meaningful mandatory interactive process and cooperative dialogue in good faith to provide reasonable accommodations.

139.   As such, Defendants have violated the ADA, NYSHRL and NYCHRL.

140.   Additionally, Defendants failed to engage in a meaningful cooperative dialogue with Plaintiff after notice of Plaintiff's medical needs as alleged in the Statement of Facts, and failed to provide a credible written explanation as to why these accommodations are not possible for AK and for the experience and role Plaintiff had.

141.   As a direct and proximate consequence of Defendants' discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, economic loss and emotional distress, all in amounts to be determined at trial.

142.   Defendants' discriminatory conduct was willful and in reckless disregard of Plaintiff's protected rights.  As such, Plaintiff is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**Retaliation in Violation of**
**the ADA (Against Defendant AK) and the**
**NYSHRL and NYCHRL**
**(Against All Defendants)**

143.   Plaintiff hereby realleges and incorporates each and every allegation contained in this Complaint with the same force as though separately alleged herein.

144.   Defendant AK violated the ADA, and all Defendants violated the NYSHRL and NYCHRL, because they knowingly retaliated against Plaintiff for objecting to the discrimination at AK and requesting reasonable accommodations for his disabilities as alleged in the Statement of Facts above.

145.    Defendants were aware that Plaintiff engaged in the protected activities alleged above.

146.    Because of his protected activities, Defendants took retaliatory adverse employment actions against Plaintiff as alleged in the Statement of Facts above.

147.    The unlawful retaliation against Plaintiff by Defendants was done with malice and reckless indifference to Plaintiff's protected rights.

148.    As a direct and proximate result of the unlawful retaliation by Defendants, Plaintiff has suffered damage to his career path, adverse job consequences, including economic damages, and continues to suffer damages, including severe mental, physical and emotional stress, pain and suffering, anxiety, stress, humiliation, loss of enjoyment of life and damage to his reputation and career.

## JURY DEMAND

149.    Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff demands a judgment against Defendants as follows:

A.    Issue a declaratory judgment declaring that the actions of the Defendants, as set forth in this Complaint, violated:  (i) Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; (ii) Americans with Disabilities Act, codified at 42 U.S.C. §§ 12101 et seq.; (iii) the New York State Human Rights Law, N.Y. Exec. Law. § 290 et seq.; (iv) the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq.; and (v) that Defendants' foregoing acts of discrimination, harassment and retaliation against Plaintiff were intentional and willful.

B.    Enjoin and restrain the Defendants and all persons acting on their behalf, or in concert with them, from engaging in such unlawful discriminatory and retaliatory practices;

C.      Enter judgment in favor of the Plaintiff, and against the Defendants, for back pay, front pay, and lost benefits, including, among other things, in the amount of the wages and bonuses it is determined that the Plaintiff lost as a result of the Defendants' unlawful, discriminatory and retaliatory conduct, together with interest (and adjusted to make Plaintiff whole for any increased tax liability incurred by his receipt of a lump sum payment in a single year);

D.      Enter judgment in favor of the Plaintiff, and against the Defendants for compensatory damages, including but not limited to, damages for Plaintiff's mental anguish, humiliation, lack of self-respect, emotional and physical pain, suffering and illness, together with interest;

E.      Award the Plaintiff punitive damages;

F.      Award the Plaintiff liquidated damages;

G.      Award the Plaintiff reasonable attorney's fees, interest, and expenses together with the costs of this action;

H.      Award such other and further legal and equitable relief as may be appropriate to redress fully the deprivation of the Plaintiff's rights under the laws cited herein, to prevent their recurrence in the future and to protect other employees from such unlawful behavior; and

I.      Such other and further relief as the court deems appropriate to be determined at trial.

Dated: New York, New York
        October 27, 2023

Respectfully submitted,

By: _____
        Tiffany Ma, Esq.
        Young & Ma LLP
        445 Park Avenue, 9th Floor

New York, NY 10022
T: (646) 379-7703
F: (866) 839-4306
tma@youngandma.com